IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ABBY PERRY-HARTMAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No.: 17-cv-4732 |
| | : | |
| THE PRUDENTIAL INSURANCE COMPANY | : | |
| OF AMERICA, | : | |
| Defendant. | : | |

## MEMORANDUM

**SITARSKI, M.J.**                                                                 **July 20, 2021**

Presently pending before the Court is Defendant's Motion for Summary Judgment (Def.'s Mot. for Summ. J., ECF No. 37), Plaintiff's response thereto (Pl.'s Resp., ECF No. 41) and Defendant's reply in support of its motion.  (Def.'s Reply, ECF No. 45).  For the reasons that follow, Defendant's motion is **GRANTED in part** and **DENIED in part**.

## I.       FACTUAL AND PROCEDURAL HISTORY

Defendant hired Plaintiff in 2000 as an Associate Manager in the Cash Management group of its Individual Life Insurance Service Delivery department.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 1).  In 2007, she transferred to another Associate Manager position with the Manual Intervention group.  (*Id.* at ¶ 2).  In this role, she supervised a team of associates who manually performed calculations related to Defendant life insurance policies.  (*Id.* at ¶ 3).

From October 2007 until mid-April 2015, Joanne Minor, Manager of Customer Service, supervised Plaintiff.  (*Id.* at ¶ 4).  In January 2014, Plaintiff emailed Minor regarding a dispute with her coworker. (Jan. 24, 2014 Email, ECF No. 41-4).  The email informed Minor,

apparently for the first time, of Plaintiff's post-traumatic stress disorder (PTSD).  (*See id.*)
Plaintiff avers that she also suffers from diabetes, depression and anxiety.  (Compl., ECF No. 1,
at ¶ 8).

      As Plaintiff's supervisor, Minor had responsibility for completing Plaintiff's Interim
Performance Appraisal and Annual Performance Review each year.  (*Id.* at ¶ 8; *see also id.* at ¶¶
13, 17).  In July and early December, prior to each review, Managers attend calibration sessions
to discuss and rate the performance of the Associate Managers who report to them.  (*Id.* at ¶¶ 11,
119).  The Interim Performance Appraisal covers the first six months of the year only.  (*See id.* at
¶ 12).  It does not include an overall rating, but it informs the employee where he or she "is
trending" in that regard.  (*Id.* at ¶ 10).  The Annual Performance Review includes an overall
rating of "Exceptional Contributor," "High Contributor," "Effective Contributor," "Greater
Contributions are Needed" (GCN), or "Unsatisfactory Contributor."  (*Id.* at ¶ 9).

      Throughout the period that Minor supervised Plaintiff, Minor's reviews of Plaintiff noted
various issues with her behavior and performance, including her leadership, verbal
communication and listening skills, and professionalism.  (*Id.* at ¶¶ 6-7).  Plaintiff's 2014 Interim
Performance Appraisal, provided to her in August, noted Plaintiff's unprofessional tendency to
share private information, failure to filter messaging to peers and subordinates, and overall need
to change her communication style.  (*Id.* at ¶¶ 12-14).  However, Minor rated Plaintiff as an
Effective Contributor, or trending that way, on all reviews from 2008 through and including her
2014 Interim Performance Appraisal.  (Minor Dep. Tr., ECF No. 41-4, Ex. C at 12:8-10, 24:12-
17).

      In October 2014, Plaintiff sent Minor a letter regarding a perceived lack of support in the
workplace.  (Oct. 22, 2014 Ltr., ECF 41-4, at Ex. D).  The letter did not mention PTSD
specifically but referred to Plaintiff's "conditions," "declining" "personal health," "feeling . . .

depressed," and "feeling so down for so long now that I have actually contemplated going out on disability." (*Id.*).

Plaintiff received her 2014 Annual Performance Review in February 2015. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 16). In the review, Minor rated Plaintiff as GCN. (*Id.* at ¶ 17). The review identified as ongoing areas of concern Plaintiff's unprofessionalism and inconsistent leadership and noted that she had not significantly improved in these areas or with her communication skills. (*Id.* at ¶ 18). It warned that Defendant would place Plaintiff in performance counseling if she did not soon demonstrate significant improvement. (*Id.* at ¶ 19).

In mid-April 2015, Nancy Smyth replaced Minor as Plaintiff's supervisor. (*Id.* at ¶ 32). On April 22, 2015, Smyth held a meeting with Plaintiff and the other Associate Managers. (*Id.* at ¶ 43). At a coaching session later that day, Smyth told Plaintiff that she did not approve of her body language during the earlier meeting. (*Id.*). Plaintiff replied that she had a disability that caused uncontrollable body language responses. (*Id.* at ¶ 44). Smyth responded, "Well, maybe you don't belong here, maybe this isn't the job for you." (*Id.*). Later in the conversation, Smyth lunged over the desk, made a gun gesture with her hand, pointed it close to Plaintiff's head and stated, "I'm not Joanne Minor, I'll give it to you straight between the eyes and you better learn how to take it." (*Id.* at ¶ 45).

Plaintiff returned the following day, April 23, 2015, to inform Smyth that she did not appreciate how Smyth had spoken about her disability. (*Id.* at ¶ 46). During the conversation, Plaintiff told Smyth, "[I]f I talked to my people the way you talked to me, I'd be in HR in five

minutes." (*Id.* at ¶ 48). Smyth countered, "Well, go ahead, Abby, see where that will get you."[1] (*Id.*).

In July 2015, Plaintiff raised concerns about Smyth with Kimberly King, Vice President of Policyholder Administration, who relayed them to Jodi Bloch, Director of Human Resources (HR). (*Id.* at ¶¶ 65, 70). In subsequent communications between Bloch and Plaintiff, Plaintiff told her about Smyth's comments and the handgun gesture. (Bloch Dep. Tr., ECF No. 42, Ex. I at 67:11-68:7). Plaintiff also attempted to tell Bloch about her disability, but she informed Plaintiff that Defendant's Accommodations unit handled that information. (*Id.* at 42:20-23).

On July 29, 2015, Bloch and HR Manager Eve Young met with Smyth and Plaintiff to discuss how they could communicate better, exchange feedback, and improve their working relationship. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 81). The following day Plaintiff submitted a Workplace Accommodation Request to Defendant's Health and Wellness group. (*Id.* at ¶¶ 80, 84). The request enumerated four accommodations that Plaintiff considered necessary to carry out her job functions: (1) to work remotely three to four days per month to manage stress; (2) to have a "support person" present for one-on-one meetings with Smyth; (3) to have Smyth provide primarily written feedback; and (4) to have additional individuals besides Smyth evaluate her performance and determine her ratings and salary. (July 30, Workplace Accommodation Request, ECF No. 39, at 3). Plaintiff also wrote that she could perform her job functions if Defendant provided her with a calm, supportive and professional environment. (*Id.*).

---

[1] During another meeting between Smyth and Plaintiff, Plaintiff told Smyth she was "afraid of her and retaliation." (Pl. Dep. Tr., ECF No. 43, Ex. A at 132:19-20). Smyth responded, "Oh, Abby, you're a grown woman, what am I going to do? Beat you up." (*Id.* at 132:20-21). The record does not indicate when this exchange occurred.

On August 20, 2015, Diane Hettinger, Director of Return to Work and Accommodations, provided Defendant's response to her request. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 93). Defendant permitted Plaintiff to work remotely a few days per month. (*Id.* at ¶ 86). Although it refused her request to have a support person present for all individual meetings with Smyth, Young nevertheless started to attend discussions about performance evaluations between Smyth and Plaintiff. (*Id.* at ¶ 88). Young also met with Plaintiff each month. (*Id.*). Defendant denied Plaintiff's request to have Smyth provide mainly written feedback, even though Smyth did, at times, provide written feedback. (*Id.* at ¶ 90). As for Plaintiff's fourth request, that others beyond Smyth participate in her review and the determination of her ratings and compensation, HR personnel and higher management were already doing so. (Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 198:19-199:2).

Plaintiff received her 2015 Interim Performance Appraisal, completed by both Minor and Smyth, on August 21, 2015. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 95). The review identified ongoing issues regarding Plaintiff's leadership, verbal communication and listening skills, and tendency to act based on emotion. (*Id.* at ¶ 96).

On March 11, 2016, Plaintiff emailed Young and Smyth advising them that she had filed a dual charge with the Equal Opportunity Employment Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC). (Mar. 11, 2016 Email, ECF No. 41-1, Ex. N). Also on March 11, 2016, Smyth signed Plaintiff's 2015 Annual Performance Review, jointly completed by Minor and her. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 106; 2015 Annual Performance Review, ECF No. 37-6, Ex. 25). Plaintiff received the review on March 16, 2016. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 105). Plaintiff again received a GCN rating, as in her prior annual review. (*Id.*). The review also noted similar issues as those raised in prior reviews. (*See id.* at ¶ 107). It gave examples of inappropriate and

unprofessional comments she had made, including a disclosure of confidential information at the end of 2015 for which she received a formal Written Warning in February 2016. (*Id.* at ¶¶ 102-03). The review warned that if her leadership did not improve, Defendant might terminate her. (*Id.* at ¶ 107).

On May 20, 2016, Plaintiff submitted a second Workplace Accommodation Request. (*Id.* at ¶ 108). This request cited three accommodations that Plaintiff believed would allow her to perform her job duties: (1) to continue working remotely at times to manage stress; (2) "a transfer" away from Smyth; and (3) to have no one-on-one meetings with Smyth. (May 20, 2016 Workplace Accommodation Request, ECF No. 39-1, at 5). Plaintiff also repeated her desire for "a safe, supportive working environment." (*Id.*).

Defendant continued to permit Plaintiff to work remotely a few days per month. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 110). To address the request for a "transfer" away from Smyth, Hettinger confirmed with Bloch that no open suitable positions existed.[2] (*Id.* at ¶ 112). Defendant otherwise refused to provide Plaintiff with a new supervisor. (*Id.*). Defendant also again refused Plaintiff's request to interact with Smyth only in the presence of a third party. (*Id.* at ¶ 114). Nonetheless, it agreed that an HR representative would attend performance evaluation meetings between Smyth and Plaintiff. (*Id.*) It also agreed to have Young attend other meetings between Smyth and Plaintiff. (*Id.*). In addition, Bloch discussed with Smyth and Plaintiff how they could have productive meetings between themselves only, without others present. (*Id.* at ¶ 115).

---

[2] Plaintiff notes that Defendant had hired a new Associate Manager in March 2016. (Def.'s Resp. to Pl.'s Interrogatories, ECF No. 41-8, Ex. S, at Resp. No. 1). She also notes that Defendant had transferred her six times over the course of her career. (Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 256:12-14).

On August 15, 2016, King proposed the reorganization of Plaintiff's group to centralize its technical work, including moving all technical process specialists under a single Technical Process Management Specialist as opposed to different Associate Managers.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 122).  King proposed eliminating one of the Associate Managers because they would have fewer reports after the reorganization.  (*Id.* at ¶ 123).  However, neither she, nor Smyth, had any say in determining which Associate Manager to terminate.  (*Id.* at ¶¶ 124, 128).  Rather, HR Director Bloch selected the person from among 32 Associate Managers based upon their two most recent reviews, the 2015 Annual Performance Review and the 2016 Interim Performance Appraisal.  (*Id.* at ¶¶ 125-26).  Bloch chose Plaintiff because she had performed the worst, according to these reviews.  (*Id.* at ¶ 127).

Smyth finalized Plaintiff's 2016 Interim Performance Appraisal in July 2016 but could not provide it to her as scheduled in August 2016 because Plaintiff had taken approved leave under the Family Medical Leave Act (FMLA).  (*See id.* at ¶¶ 121, 129, 133).  Instead, she provided Plaintiff with the review on October 13, 2016, after Plaintiff had returned to work from her FMLA leave.  (*Id.* at ¶ 133).  Smyth rated Plaintiff as trending GCN and identified similar leadership and professionalism issues as those identified in earlier reviews.  (*Id.* at ¶¶ 120, 134).

On October 20, 2016, Defendant sent Plaintiff a letter notifying her that it was eliminating her position pursuant to the reorganization originally proposed by King.  (*Id.* at ¶ 136; *see also id.* at ¶¶ 122-23; Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 277:17-278:2).  Under the terms of the separation, Defendant placed Plaintiff on paid leave from November 5, 2019, through November 19, 2019, and terminated her employment effective December 19, 2019.  (*Id.* at 278:3-12). Throughout this period, Plaintiff had the ability to apply for other positions within the company but chose not to do so because she believed that "no one would touch [her]" in light of Smyth's reviews.  (*Id.* at 278:13-25).

At Plaintiff's deposition in this matter on January 22, 2019, Defendant learned that in the summer and fall of 2016, Plaintiff forwarded thousands of Defendant's documents to her personal email account.  (*See* Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 1). Many of the documents were proprietary and confidential, Plaintiff lacked permission to take them, and she had no demonstrated intention of returning them.  (Limsky Cert., ECF No. 37-9, at ¶¶ 6-8).  She testified that she took the documents because she anticipated that Defendant would terminate her.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 137).  Her misappropriation of the documents violated company policy.  (Limsky Cert., ECF No. 37-9, at ¶ 8).  In particular, Defendant's "Digital Communications and Internet Use Standards" (Communications Standards) authorized employees to send "confidential, privileged, proprietary or sensitive business-related information or trade secrets . . . outside Prudential only if there is a legitimate business need . . . ."  (Limsky Cert., ECF No. 37-9, Tab 1, at 1).  The Communications Standards specifically disallowed "[f]orwarding e-mail from your Prudential account that contains proprietary Prudential Information to your personal e-mail . . . ."  (*Id.*).  Likewise, Defendant's "Protecting Prudential Information and Assets" policy (Information Policy) mandated, *inter alia*, that Plaintiff:

- Use Prudential's information for appropriate business purposes only;
- Prevent improper use and disclosure of information;
- Protect and secure Prudential's information/data (e.g., customer, associate, business partner, product, and financial) in all forms against unauthorized use, access, duplication, disclosure, modifications or destruction;
- Maintain appropriate controls to safeguard Prudential's information and intellectual property in all its forms[.]

(*Id.* Tab 2, at 1).

On June 28, 2019, Defendant filed the instant motion for summary judgment, its supporting memorandum and its statement of facts.  (Def.'s Mot. for Summ. J., ECF No. 37;

Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1; Def.'s Statement of Undisputed

Material Facts, ECF No. 37-2).  On July 30, 2019, Plaintiff filed its responsive brief.[3]  (Pl.'s

Resp., ECF No. 41-1).  On August 16, 2019, Defendant filed a reply in support of its motion.

(Def.'s Reply, ECF No. 45).  On January 6, 2021, this case was reassigned to me from the docket

of the Honorable Jacob P. Hart.  (Order, ECF No. 50).


## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An

issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-

moving party.  *Id.*  It is not the court's role to weigh the disputed evidence and decide which is

more probative, or to make credibility determinations.  Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-

88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654,

655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361

(3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must

accept as true the allegations of the non-moving party, and "all justifiable inferences are to be

drawn in his favor."  *Anderson*, 477 U.S. at 255.

---

[3]  Plaintiff chose not to file a counterstatement of facts.  (Pl.'s Resp., ECF No. 41-1, at 2
n.2).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.

## III.   DISCUSSION

Plaintiff asserts claims for discrimination, retaliation, failure to accommodate and hostile work environment under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.* The same legal standards and analysis apply to claims under these statutes, "and hence it is not uncommon to address such claims collectively." *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004) (citing *Bailey v. Storlazzi*, 729 A.2d 1206 (Pa. Super. Ct. 1999)). Defendant moves for summary judgment on all of Plaintiff's claims, and also seeks summary judgment on the basis of its after-acquired evidence defense.

A. **Discrimination**

1. **Background Law**

To prevail on a claim for discrimination, a plaintiff must show that "the protected trait actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This showing that a protected trait had a determinative influence on the decision of the employer can be made either through direct evidence or circumstantial evidence. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

A claim based upon direct evidence must meet the standard set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *superseded by statute on other grounds as stated in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, __ U.S. __, 140 S.Ct. 1009, 1017 (2020). "Therefore, in accordance with Justice O'Connor's opinion in *Price Waterhouse*, in order to prove a claim of discrimination in violation of the ADA based upon . . . a direct evidence theory, the Plaintiff must present direct evidence that his alleged disability was a 'substantial factor' in the [Defendant's] alleged [adverse employment] decision . . . ." *Benko v. Portage Area Sch. Dist.*, No. Civ.A. 03-233J, 2006 WL 1698317, at *6 (W.D. Pa. June 19, 2006) (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 n.2 (3d Cir. 2002)). "Direct evidence means evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the Plaintiff's disability] in reaching their decision to fire him." *Id.* (quoting *Fakete*, 308 F.3d at 338 n.2) (internal quotations omitted). If direct evidence is presented the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have taken the same action even if it had not considered the plaintiff's disability. *See id.* at 338 (citing *Price Waterhouse*, 490 U.S. at 265-266).

If there is no direct evidence of discrimination, a plaintiff may present circumstantial evidence of discrimination. *Fuentes*, 32 F.3d at 764. If circumstantial evidence is presented, a plaintiff must satisfy the standard set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Embrico v. U.S. Steel Corp.*, 245 F. App'x. 184, 187 (3d Cir. 2007); *see also Glanzman*, 391 F.3d at 512. *McDonnell Douglas* requires that a plaintiff show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir.1999). "[T]he prima facie case under the *McDonnell Douglas* pretext framework is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). A prima facie case of disability discrimination requires that the plaintiff successfully show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) she was subject to some adverse action as a result of her disability. *See Gand v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

If a plaintiff meets the *McDonnell Douglas* standard, the burden of production shifts to the employer who must come forward with a legitimate, nondiscriminatory reason for the adverse employment decision. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000) (citing *Burdine*, 450 U.S. at 254-56). The employer is not required to prove that this nondiscriminatory reason actually motivated the action in order to shift the burden back to the plaintiff. *Fuentes*, 32 F.3d at 763.

If a defendant offers a legitimate, nondiscriminatory reason for its actions, the plaintiff survives summary judgment only by "present[ing] sufficient evidence to raise a genuine issue of

fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action." *Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997); *see also Jones*, 198 F.3d at 413.  Thus, a plaintiff survives summary judgment by proffering "admissible evidence[ ] that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," or by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Jones*, 198 F.3d at 413.  To discredit a legitimate reason proffered by an employer, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765.

In attempting to discredit a defendant's proffered reasons, however, a plaintiff cannot simply show that the defendant's decisions were mistaken.  The inquiry is whether the defendant was motivated by discriminatory animus, not whether the defendant was wise, shrewd, prudent or competent.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1996) ("federal courts are not arbitral boards ruling on the strength of the 'cause' for the [adverse employment action].  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."); *see also Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992).

Significantly, the ultimate burden of persuasion always remains with the plaintiff, and the ultimate question is whether, after all the evidence is in, the plaintiff has proven her case by a preponderance of the evidence.  *Aikens*, 460 U.S. at 711.  Even during the pretextual analysis, the employer has no burden to prove that its proffered reasons are true; rather, the plaintiff must

prove by a preponderance of the evidence that the proffered reasons are pretextual.  *Burdine*, 450 U.S. at 256.

### 2.   Application

The parties agree that the Court should analyze Plaintiff's discrimination claim under the burden-shifting framework set forth in *McDonnell Douglas* and that the framework applies to claims based on circumstantial evidence.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 23; *see* Pl.'s Resp., ECF No. 41-1, at 16; *see also Venter v. Potter*, 694 F. Supp. 2d 412, 421 (W.D. Pa. Mar. 9, 2010) ("'Direct evidence' of discrimination is evidence that is '*so revealing of discriminatory animus that it is not necessary to rely on any presumption*' from the plaintiff's prima facie case to shift the applicable burden of production to the defendant.") (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995) (emphasis in original))).  Defendant does not dispute that Plaintiff has made out a prima facie case of discrimination.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 23).  Rather, it argues that it has pointed to a legitimate, nondiscriminatory reason for Plaintiff's termination and that Plaintiff has failed to offer evidence of pretext.

A corporate reorganization or workforce reduction is a legitimate, nondiscriminatory reason for terminating employees.  *See Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 744-45 (E.D. Pa. July 30, 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016); *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 701 (W.D. Pa. Jan. 8, 2014).  Here, the undisputed evidence shows that in August 2016 King proposed reorganizing Plaintiff's Manual Intervention group to centralize its technical work, including having all technical process specialists report to a single Technical Process Management Specialist rather than different Associate Managers.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 122).  Because the Associate Managers would have fewer direct reports, King proposed eliminating one Associate Manager position, but

had no involvement in determining which one would be eliminated.  (*Id.* at ¶¶ 123-24).  Nor was Smyth involved in the determination.  (*Id.* at ¶ 128).  Rather, Bloch selected Plaintiff from among 32 Associate Managers because she had performed the worst according to her two most recent reviews, the 2015 Annual Performance Review and 2016 Interim Performance Appraisal. (*Id.* at ¶¶ 125-27).

With the Defendant having articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden now shifts back to Plaintiff.  *See Stewart*, 120 F.3d at 433 (3d Cir. 1997); *Jones*, 198 F.3d at 413.  "There is a low bar for establishing a prima facie case of employment discrimination.  However, a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons."  *Andersen*, 118 F. Supp. 3d at 744-56 (quoting *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 (3d Cir. 2006); *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994); citing, 983 F.2d at 523) (internal quotations and additional cited cases omitted).  "As long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by more senior workers."  *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1469 (6th Cir. 1990)).  A "plaintiff in a work force reduction case must present direct, circumstantial, or statistical evidence that [discrimination] was a determining factor in his job displacement."  *Id.* (citing *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1991)).

Plaintiff points to two pieces of evidence to show that Defendant's unlawful discrimination played a determining role in her termination.  First, she points to the circumstances surrounding her rating drop from "effective" to "GCN" in her 2014 Annual Performance Review completed by Minor.  (Pl.'s Resp., ECF No. 41-1, at 18).  She contends that

this drop "was preceded by Plaintiff writing to [Minor] about her disability and problems it was causing her while also mentioning the possibility of going out on disability, and asking Ms. Minor for help" in a January 2014 email regarding a dispute with a coworker.  (*Id.*; Jan. 24, 2014 Email, ECF 41-4 at Ex. H).  She also notes that Minor referred to her "PTSD reactions" in discussions about the review and that the EOS surveys and leadership scores upon which the drop was partially based were available when Minor had rated her "trending effective" on her 2014 Interim Performance Appraisal.  (*Id.*).  Second, she points to her April 22, 2015 coaching session with Smyth.  (Pl.'s Resp., ECF No. 41-1, at 18).  Plaintiff alleges that at this session Smyth told her that she did not like her body language during an earlier meeting.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 43).  According to Plaintiff, she informed Smyth that she had a disability that caused automatic bodily responses, to which Smyth responded, "Well, maybe you don't belong here, maybe this isn't the job for you."  (*Id.* at ¶ 44).

As a threshold matter, the parties dispute whether Minor's and Smyth's statements and actions could establish that discrimination served as a "determining factor" in Plaintiff's termination where it remains undisputed that neither had direct involvement in that decision. Defendant contends that this fact forecloses any showing of causation by Plaintiff.  (Def.'s Reply, ECF No. 45, at 4).  Plaintiff argues that an "adamantine chain of . . . factual links" runs from Minor's and Smith's discriminatory intent, to her GCN ratings on her 2015 Annual Performance Review and 2016 Interim Performance Appraisal, to her termination based on these ratings in these reviews.  (Pl.'s Resp., ECF No. 41-1, at 17).  Taking all facts in the light most favorable to Plaintiff, the Court agrees that a jury could find that discrimination played a determinative role in Plaintiff's termination.  If the GCN ratings in Plaintiff's 2015 Annual Performance Review and 2016 Interim Performance Appraisal resulted from discrimination, and Bloch based Plaintiff's termination on these ratings, a jury could find that discrimination was a

"but for" cause of her termination. *See Fuentes*, 32 F.3d at 764. In other words, although it is undisputed that Defendant did not undertake the corporate reorganization with the purpose of terminating Plaintiff based upon discrimination, discrimination may nonetheless have served as a "determining factor" in her termination if the performance reviews upon which it was based were themselves the product of discrimination. *See Wilson*, 932 F.2d at 517 (a plaintiff who loses his position in a workforce reduction may survive summary judgment by presenting evidence that discrimination "was a determining factor" in the decision).

Defendant's cited corporate reorganization cases are distinguishable on this basis. In these cases, the evidence did not support a finding that discrimination played a role in how the employer carried out the reorganization. *See Kelley v. AmerisourceBergen Corp.*, No. 08-2377, 2009 WL 3127752, at *8 (E.D. Pa. 2009) (noting that the defendant based its decision to terminate the plaintiff on a comparison of employee records, but the plaintiff did not argue that the records were influenced by discrimination); *see also Rubano*, 991 F. Supp. 2d at 703 (concluding that the evidence showed that the plaintiff lost job duties due to a reorganization unrelated to any discrimination); *Andersen*, 118 F. Supp. 3d at 746 (finding that the plaintiff's arguments regarding the defendant's reorganization "attacked Defendants' . . . business judgment. They do not link the decision to terminate Plaintiff to . . . bias."). Defendant also cites a few cases for the proposition that mere "disagreement with . . . performance reviews" does not establish discrimination. (Def.'s Reply, ECF No. 45, at 5). However, in none of these cases did the plaintiff submit evidence to establish that the negative review or assessment resulted from discrimination. *See Sterner v. Siemens Med. Solutions USA, Inc.*, 706 F. App'x 772, 775 (3d Cir. 2017) (the plaintiff argued "that her supervisor . . . misjudged her performance"); *Carter v. Mid-Atl. Healthcare, LLC*, 228 F. Supp. 3d 495, 508 (E.D. Pa. Jan. 12, 2017) (noting that the plaintiff "failed to set forth any evidence to refute, contradict, or cast doubt upon" the fact that she

performed poorly in her job); *Boyd v. Citizens Bank of Pa., Inc.*, No. 2:12-cv-00332, 2014 WL 2154902, at *24-25 (W.D. Pa. May 22, 2014) (finding that none of the plaintiff's arguments regarding discrimination in the context of her performance evaluation were supported by record evidence).

Additionally, Defendant contends that Plaintiff cannot base her claim upon Minor's lowering of her rating to GCN after receiving notice of Plaintiff's PTSD or Minor's statement about how her "PTSD reactions" "were going to look to Nancy Smyth," who was replacing Minor, because at Plaintiff's deposition she "unequivocally testified that Minor . . . did ***not*** engage in unlawful harassment or discrimination[.]"  (Def.'s Reply, ECF No. 45, at 6 (emphasis in original)).  However, Plaintiff's deposition testimony is not as clear as Defendant suggests. Plaintiff agreed that her complaint does not specifically reference Minor and that the reference to "Defendant's actions" in paragraph 35 of her complaint refers to Smyth, but she did not testify that Smyth discriminated against her exclusively or that Minor did not also discriminate against her.  (Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 74:8-12, 283:23-284:10).  When asked whether she contended "that Ms. Minor engaged in unlawful harassment and unlawful discrimination because of [her] disability," Plaintiff responded, "I don't believe, in my heart of hearts, that she did what Nancy did."  (*Id.* at 74:13-18).  But this response is susceptible to multiple interpretations, including that Smyth did not discriminate against Plaintiff in the same manner or to do the same degree that Minor did.  Viewed in this light, the testimony does not foreclose the possibility that Minor, too, discriminated against Plaintiff.  Indeed, taking the evidence in the light most favorable to Plaintiff, a jury could find that Minor lowered Plaintiff's rating to GCN in her 2014 Annual Performance Review after receiving the January 2014 email from Plaintiff about her

disability[4] and, in a discussion about that review, asked Plaintiff to consider how Smyth would perceive Plaintiff's physical manifestations of her disability.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 17; Pl. Dep. Tr., ECF No. 43, Ex. A at 56:24-57:1).  A jury could further find that Plaintiff's deposition testimony regarding Smyth's not doing "what Nancy did" referred only to the degree or manner of the discrimination suffered.  The Court declines to take this issue of discrimination by Smyth from the jury on the basis of unclear deposition testimony.

As to Smyth, Defendant argues that Smyth's April 22, 2015 comment to Plaintiff, "Well, maybe you don't belong here, maybe this isn't the job for you," does not support a finding of discrimination.  (Def.'s Reply, ECF No. 45, at 7).  Defendant quotes *Fuentes*: "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great

---

[4]  Defendant contends that Minor could not have discriminated against Plaintiff in her 2014 Annual Performance Review after learning of her disability in the January 2014 email because Minor rated Plaintiff "trending effective" in her intervening 2014 Interim Performance Appraisal. (Def.'s Reply, ECF No. 45, at 7).  However, Defendant's argument pertains only to the credibility of Plaintiff's evidence.  Defendant points to no authority requiring that an employer who learns of an employee's disability discriminate against the employee consistently or at the earliest opportunity for the employee to maintain her claim.  In addition, Defendant acknowledges that the "purpose" of the interim appraisal is only "to inform employees where their performance is trending in terms of an overall rating, but the overall rating is not included" in the final annual review.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 10).  Thus, the fact that Minor noted that Plaintiff was "trending effective" in her interim review issued after the January 2014 email does not serve as a basis for summary judgment.

Further, in October 2014, Plaintiff sent Minor a letter regarding a perceived lack of support in the workplace and related issues.  (Oct. 22, 2014 Ltr., ECF 41-4, at Ex. D).  Defendant contends that this letter "is devoid of any reference to Plaintiff's PTSD or a disability on its face."  (Def.'s Reply, ECF No. 45, at 7).  The letter did not reference Plaintiff's PTSD specifically, but Minor already knew of it from Plaintiff's earlier email.  (Jan. 24, 2014 Email, ECF 41-4 at Ex. H).  The letter otherwise referenced Plaintiff's disabled status.  Plaintiff noted "declining" "personal health," "my conditions" and "feeling . . . depressed[.]" (Oct. 22, 2014 Ltr., ECF 41-4, at Ex. D).  She stated: "I have been feeling so down for so long now that I have actually contemplated going out on disability." (*Id.*).  This letter could also have served to notify Minor that Plaintiff suffered from a disability.

weight, particularly if they were made temporally remote from the date of decision." (*Id.*
(quoting *Fuentes*, 32 F.3d at 767)).  However, Smyth was a decisionmaker as to Plaintiff's 2015
Interim Performance Appraisal, 2015 Annual Performance Review and 2016 Interim
Performance Appraisal, and the latter two reviews ultimately served as the basis for Plaintiff's
termination.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶¶ 96, 106, 127, 133-
135).  Smyth's comment did not directly relate to these reviews, but it occurred within the period
covered by the 2015 Interim Performance Appraisal and 2015 Annual Performance Review and
could be construed as relating to Plaintiff's professionalism and communication, two of the areas
of concern identified in her reviews.  (2015 Interim Performance Appraisal, ECF No. 37-6, Ex.
22 at 5; 2015 Annual Performance Review, ECF No. 37-6, Ex. 25 at 12; 2016 Interim
Performance Appraisal, ECF No. 37-6, Ex. 31 at 6).  Further, Smyth made the comment only a
few months prior to the completion of her 2015 Interim Performance Appraisal and less than
nine months prior to the determination of her GCN rating for her 2015 Annual Performance
Review.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶¶ 11, 43-44, 119).  Thus,
the evidence of discriminatory intent is not as "temporally remote" as in *Fuentes* or the case from
which it quotes, *Ezold*.  *See Fuentes*, 32 F.3d at 767 (statements allegedly evincing
discriminatory intent occurred 20 months prior to adverse employment action) (quoting *Ezold*,
983 F.3d at 545); *Ezold*, 983 F.2d at 545 (statements allegedly evincing discriminatory intent
occurred five years prior to adverse employment action).

Lastly, Defendant contends that "Smyth had no knowledge of Plaintiff's specific
disability, including her PTSD."  (Def.'s Reply, ECF No. 45, at 7).  However, even if Plaintiff
did not name her exact disability for Smyth, she "told Smyth that she had a disability that caused
auto responses with her body language."  (Def.'s Stmt. of Undisputed Material Facts, ECF No.
37-2, at ¶ 44).  Thus, a jury could find that Smyth's response  -- that maybe Plaintiff did not

"belong" in her position or that it was not the "job for [her]"-- demonstrated discriminatory animus toward Plaintiff's disability, even without a specific name attached to it.  (*Id.*).

Defendant has offered a legitimate, nondiscriminatory reason – the reorganization of Plaintiff's group – for terminating Plaintiff.  However, Plaintiff has responded with evidence that the performance review ratings Defendant used to select her for termination themselves resulted from discrimination.  If a jury credits Plaintiff's evidence, it could conclude that discrimination thus operated as a determining factor in the ultimate decision to terminate her.  Accordingly, the Court shall deny Defendant's motion for summary judgment as to Plaintiff's discrimination claim.

### B.       Retaliation

#### 1.       Background Law

Plaintiff's retaliation claim is also governed by the *McDonnell Douglas* burden-shifting framework.  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *see also Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (noting that in the absence of direct evidence of retaliation, retaliation claims ordinarily proceed under the *McDonnell Douglas* framework).  To advance a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) the employer took a "materially adverse" employment action; and (3) a causal connection exists between the employee's protected activity and the adverse employment action. *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  To establish the requisite causal connection, a plaintiff must prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson*, 109 F.3d at

920-21.  In assessing a causal connection, a reviewing court must consider "the specific facts and circumstances encountered."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000).

If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. *Krouse*, 126 F.3d at 500.  The employer's burden at this stage is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]."  *Id.* at 500-501 (quoting *Woodson*, 109 F.3d at 920 n.2).

If the employer satisfies its burden, the plaintiff must convince the factfinder both that the employer's proffered explanation was false and that retaliation was the real reason for the adverse employment action.  *Krouse*, 126 F.3d at 501; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").  The plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.  *Woodson*, 109 F.3d at 931-35.  The burden of proof remains at all times with the plaintiff.  *Id.* at 920 n.2.

### 2.    Application

Defendant challenges the third element of Plaintiff's prima facie claim, the existence of a causal connection between her protected activity and the adverse employment action.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 28-29).  It observes that it did not receive notice of Plaintiff's EEOC charge until after her 2015 Annual Performance Review had been completed and the GCN rating contained therein had been determined.  (*Id.* at 28).  It cites

four cases, including two from the Third Circuit, for the proposition that a plaintiff cannot demonstrate causation for a retaliation claim based on negative performance evaluations where the negative evaluations began before the protected activity.  (*Id.* at 28-29 (citing *Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 48 (3d Cir. 2017); *Verma v. Univ. of Pa.*, 533 F. App'x 115, 118-19 (3d Cir. 2013); *Brown v. Vanguard Grp., Inc.*, No. 16-946, 2017 WL 412802, at *18 (E.D. Pa. Jan. 30, 2017); *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 482, 485-86 (E.D. Pa. 2013))).  It also argues that Plaintiff cannot show causation based upon her termination because she has no evidence of a causal link between her EEOC charge and her termination and the length of time between them does not support a finding of causation.  *Id.* (citing *Mercer v. Se. Pa. Transp. Auth.*, 26 F. Supp. 3d 432, 447 (3d Cir. 2014)).

Plaintiff responds that informal complaints about discrimination are also protected activity and that her 2015 Annual Performance Review and 2016 Interim Performance Appraisal occurred after she complained to King and Bloch in the summer of 2015.  (Pl.'s Resp., ECF No. 41-1, at 19).  She notes that Smyth signed the 2015 Annual Performance Review on the same date Plaintiff notified Young and Minor of her EEOC filing and that "[s]uspiciously" it referenced a written warning issued to Plaintiff in February 2016, after the review period.  (*Id.*).  She claims that if retaliation motivated Smyth in completing her 2015 Annual Performance Review, a causal link exists between her termination and protected activity because the termination was based in part on the review.  (*Id.*).  Lastly, she posits that Smyth's April 2015 statement, "Well, go ahead Abby, see where that [talking to HR] will get you," could be considered "a threat of retaliatory conduct."  (*Id.*).

In reply, Defendant notes that Plaintiff makes no attempt to distinguish its cited cases and argues that her reliance on her earlier informal complaints to King and Bloch in the summer of 2015 only serves to extend the period between her protected activity and termination, thus

further undercutting any inference of causation.  (Def.'s Reply, ECF No. 45, at 9).  Defendant contends that insofar as Plaintiff seeks to rely upon her 2015 Annual Performance Review and 2016 Interim Performance Appraisal as adverse employment actions, no evidence ties either to the protected activity of Plaintiff's informal complaints to King and Bloch.  Defendant further notes that the GCN rating for the 2015 Annual Performance Review predated Plaintiff's notifying Young and Minor of her EEOC filing thus severing any causal link between this protected activity and the earlier negative rating.  It also observes that nothing prevented the 2015 review from referencing a February 2016 warning, especially where the conduct at issue occurred during the 2015 review period.  (*Id.*).  Finally, Defendant dismisses Smyth's verbal statement as a non-decisionmaker's "stray remark" unrelated in topic or time to her termination. (*Id.* (citing *Fuentes*, 32 F.3d at 767)).

Plaintiff does not dispute that the nine months between the March 2016 filing of her EEOC charge and her December 2016 termination "is a far cry" from the periods the Third Circuit has found to support a finding of causation.  *Mercer*, 26 F. Supp. 3d at 447 (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Farrell*, 206 F.3d at 278-79); *see also Lichtenstein*, 691 F.3d at 307 (one week could establish causation); *Jalil*, 873 F.2d at 701 (two days could establish causation); *cf. Farrell*, 206 F.3d at 279 (refusing to decide whether three to four weeks could alone establish causation).  Indeed, an even longer period, approximately 17 months, elapsed between Plaintiff's discussions with King and Bloch in July 2015 and her termination.  (Pl.'s Resp., ECF No. 41-1, at 8-9).  These discussions are also too temporally removed from the two reviews that factored into the decision to terminate her: her 2015 Annual Performance Review completed during the winter of 2015-2016, and her 2016 Interim Performance Appraisal completed during the summer of 2016.  (*See* Def.'s Stmt. of Undisputed Material Facts at ¶¶ 11

(ratings for annual reviews are determined in early December), 12 (ratings for 2016 Interim

Performance Appraisal were determined in mid-July 2016); *see also Mercer*, 26 F. Supp. 3d at

447 ("approximately six months" was well beyond the temporal proximity needed to infer

causation)).

Plaintiff complains that Smyth signed her 2015 Annual Performance Review on March

11, 2016, the same day that Plaintiff notified Young and Minor of her EEOC filing.  (*Id.* at 9).

However, Plaintiff admits that the GCN rating in the review was determined four months earlier

in a manager "calibration session" occurring in early December 2015.  (Pl.'s Resp., ECF No. 41-

1, at 5).  Further, this rating was the same as she had received from Minor in her 2014 Annual

Performance Review, and the issues identified in her 2015 Annual Performance Review and

2016 Interim Performance Appraisal with her communication, professionalism, and leadership

did not materially differ from the issues identified in her 2014 Annual Performance Review and

2015 Interim Performance Appraisal.[5]  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-

2, at ¶¶ 17-18, 96, 107, 134).  Thus, negative appraisals of some aspects of Plaintiff's

---

[5]  Plaintiff's 2014 Annual Performance Review concluded that "significant improvement
has not been made surrounding her professional presence, communication and leadership skills"
and warned that "if significant improvement is not made in early 2015, Abby will be placed in
performance counseling."  (2014 Annual Performance Review, ECF No. 37-4, Ex. 3 at 9).
Similarly, her 2015 Interim Performance Appraisal "strongly recommended that Plaintiff act on
the constructive feedback" provided to her to improve her "managerial behavior" and warned
that she needed to improve her "professional presence to avoid being placed in performance
management."  (2015 Interim Performance Appraisal, ECF No. 37-6, Ex. 22 at 5).  Her 2015
Annual Performance Review, completed after Plaintiff began engaging in protected activity,
noted "some improvement" but also referenced repeated "unprofessional comments" and the
need "to improve her leadership effectiveness/presence . . . ."  (2015 Annual Performance
Review, ECF No. 37-6, Ex. 25 at 12).  It, too, warned that her "behavior" required improvement:
"If Abby does not improve her overall behavior, as it relates to leadership presence, it will result
in additional administrative action, up to and including termination."  (*Id.*).  Plaintiff's final
review, her 2016 Interim Performance Appraisal, noted continuing issues with "unprofessional"
comments and counseled, "Improvement is still needed regarding Abby's Leadership presence
and effectiveness."  (2016 Interim Performance Appraisal, ECF No. 37-6, Ex. 31 at 6).

performance began prior to even the earliest protected activity identified by Plaintiff, the summer 2015 discussions with King and Bloch.  As such, the Court infers no causal connection between Plaintiff's protected activity and the 2015 Annual Performance Review and 2016 Interim Performance Appraisal considered in the decision to terminate her.  *See Lackey*, 704 F. App'x at 48 (affirming district court's grant of summary judgment in employer's favor because the plaintiff "received similar feedback on her scheduling errors both before and after" her protected activity); *Verma*, 533 F. App'x at 118-19 ("this Court has declined to infer such a causal link where an employee's negative performance evaluations predated any protected activity") (citing *Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000)); *Shaner*, 204 F.3d at 505 (affirming district court's grant of summary judgment in employer's favor because the plaintiff's "performance evaluations contained similar criticisms both before and after he made the company aware that he suffered from MS and before and after he filed his first EEOC charge"); *see also Brown*, 2017 WL 412802, at *18; *Daniels*, 982 F. Supp. 2d at 485-86.

Plaintiff also complains that her 2015 Annual Performance Review "[s]uspiciously" referenced a February 2016 written warning issued outside of the 2015 review period.  (Pl.'s Resp., ECF No. 41-1, at 20).  However, the conduct giving rise to the written warning was serious enough to merit the reference to "possible administrative action, up to and including termination," contained in the review.  (2015 Annual Performance Review, ECF No. 37-6, Ex. 25 at 12).  Moreover, the underlying conduct occurred "at the end of 2015," during the review period.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶¶ 102-03).  Plaintiff cites no authority and otherwise fails to explain why her review could not refer to matters, especially serious ones, occurring through the time of its completion.  (Pl.'s Resp., ECF No. 41-1, at 19-20).

Plaintiff's final argument in opposition to summary judgment is that Smyth demonstrated "retaliatory animus" when she told Plaintiff in response to her reference to involving HR, "Well, go ahead, Abby, see where that will get you."  (Pl.'s Resp., ECF No.41-1, at 20).  "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."  *Krouse*, 126 F.3d at 503-04.  To demonstrate causation in this manner, the plaintiff must point to "a pattern of antagonism in the intervening period" between the protected activity and the adverse employment action.  *Woodson*, 109 F.3d at 920-21.  However, Smyth's single, vague comment does not evidence "a pattern of antagonism . . . ."  *See id.*  Nor was the comment made "in the intervening period" between Plaintiff's complaints to King and Bloch and Plaintiff's subsequent performance reviews or termination.  *See id.*  Rather, Smyth made this statement prior to the complaints, Plaintiff's earliest protected activity.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶¶ 47-48).  In addition, Plaintiff had already received a GCN rating and negative feedback on her communication, professionalism, and leadership in her 2014 Annual Performance Review completed by Minor, prior to Smyth's comment.  (2014 Annual Performance Review, ECF No. 37-4, Ex. 3 at 9).  Thus, even if the comment had postdated Plaintiff's protected activity, it would not support an inference of causation because the negative reviews began before the protected activity (and under a different reviewer).  *See Lackey*, 704 F. App'x at 48; *Verma*, 533 F. App'x at 118-19; *Shaner*, 204 F.3d at 505.  Because Plaintiff cannot establish causation, an element of her prima facie claim, the Court shall grant summary judgment in Defendant's favor on Plaintiff's retaliation claim.

**C.      Failure to Accommodate**

**1.      Background Law**

The ADA prohibits an employer from failing to provide "a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  "In order to establish a prima facie case for failure to accommodate, [the plaintiff] must show that: (1) he had a disability; (2) the employer had notice of this disability; (3) he can perform the essential functions of his position with a reasonable accommodation; and (4) the employer failed to provide an accommodation." *Boice v. Se. Pa. Transp. Auth.*, No. 05-4772, 2007 WL 2916188, at *12 (E.D. Pa. Oct. 5, 2007) (citation omitted).

A plaintiff "must also demonstrate as part of his facial showing that the costs associated with his proposed accommodation 'are not clearly disproportionate to the benefits that it will produce.'" *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580-81 (3d Cir. 1998) (quoting *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).  "The term 'costs' includes financial as well as administrative burdens on a company." *Id.* at 581 (citing *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.17, 107 S.Ct. 1123, 1131 n.17, 94 L.Ed.2d 307 (1987)). "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Yovtcheva v. City of Phila. Water Dep't*, 518 F. App'x 116, 122 (3d Cir. 2013) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) (citation omitted); citing *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir. 1993)).  If the plaintiff sets forth a prima facie case, "the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Gaul*, 134 F.3d at 581 (quoting *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)).

## 2.    Application

Plaintiff submitted Workplace Accommodation Requests on July 30, 2015, and May 20, 2016.[6]  (July 30, 2015 Workplace Accommodation Request, ECF No. 39; May 20, 2016 Workplace Accommodation Request, ECF No. 39-1).  The Court considers each request separately.

### a.    July 30, 2015 Workplace Accommodation Request

Plaintiff's July 30, 2015 Workplace Accommodation Request listed four accommodations that Plaintiff believed would enable her to perform her job functions: (1) to work from home up to four days per month to "decompress stress"; (2) to have a "support person" present for any one-on-one meeting with Smyth; (3) to have Smyth provide feedback primarily in writing rather than orally; and (4) to have others in addition to Smyth "oversee [her] performance & make decisions on ratings and compensation[.]"  (July 30, 2015 Accommodation Request, ECF No. 39, at 3).  Elsewhere on the form, Plaintiff wrote that she could perform all job functions "if provided with a supportive and professional environment.  Calm environment." (*Id.* (emphasis in original)).

Defendant granted Plaintiff's request to work from home a few days per month.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 86).  It denied her request to have a support person for Plaintiff at all meetings between Smyth and her, although Young began attending performance evaluation discussions between the two and otherwise meeting with Plaintiff monthly.  (*Id.* at ¶¶ 87-88).  Defendant also denied Plaintiff's request to have Smyth provide primarily written feedback; however, "Smyth did on occasion" provide such feedback to

---

[6]  On September 2, 2016, Plaintiff submitted an additional Workplace Accommodation Request not to "sit at [her] desk all day."  (September 2, 2016 Workplace Accommodation Request, ECF No. 39-3).  This request is not at issue.

Plaintiff. (*Id.* at ¶ 90). As for Plaintiff's request that others in addition to Smyth oversee her performance and have input into her ratings and compensation, "HR [and/]or upper management" already participated in these matters. (Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 198:19-199:2).

Defendant argues that Plaintiff's two requests it did not grant – for a support person at all meetings with Smyth and for Smyth to provide primarily written feedback – "were unreasonable as a matter of law as they would have effectively foreclosed Smyth from supervising Plaintiff." (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 33). It notes that the Third Circuit has made clear that employers need not grant requests that impose "impractical" or "extraordinary administrative burdens" and that courts may not "establish the conditions of employment" under which an employee shall work. (*Id.* (citing *Gaul*, 134 F.3d at 581)). Defendant contends that it "acted in good faith to accommodate Plaintiff's disability, granting those requests that were reasonable and implementing alternative accommodations in response to her unreasonable requests." (*Id.* (citations omitted)). It also asserts that Plaintiff's PHRA claim based on this request is time-barred. (*Id.* at 32). In her response, Plaintiff does not address her July 30, 2015 Workplace Accommodation Request but instead focuses on her May 20, 2016 request for a transfer. (Pl.'s Resp., ECF No. 41-1, at 20-22).

No reasonable jury could find that Defendant was required to grant Plaintiff's requests for a support person at all meetings between Smyth and her or for Smyth to provide Plaintiff primarily written feedback. If granted, these accommodations would have required Smyth to engage with Plaintiff primarily in the presence of the support person or in writing, thereby limiting real-time, spontaneous coaching and supervision. These requirements would have placed significant "administrative burdens" on Defendant generally and Smyth specifically. *See Gaul*, 134 F.3d 576 at 581. Moreover, they would effectively permit Plaintiff "to establish the

conditions of her employment . . . [;] [h]owever, nothing in the ADA allows this shift in responsibility." *Id.* (quoting *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996)). Further, "nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy." *Id.* (quoting *Wernick v. Fed. Rsrv. Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996)). Preventing Smyth from supervising Plaintiff in-person and one-on-one by requiring Defendant to have a support person present for all meetings between them would do exactly that. Plaintiff – who does not even address these requests for accommodation in her response – fails to "demonstrate as part of [her] facial showing that the costs associated with [her] proposed accommodation 'are not clearly disproportionate to the benefits that it will produce.'" *Gaul*, 134 F.3d at 580-81 (quoting *Borkowski*, 63 F.3d at 138).

In addition, the Court notes that Defendant provided alternative accommodations or provided the requested accommodations in part. Although Defendant declined to have a support person present for all meetings between Smyth and Plaintiff, Young and Plaintiff met for monthly "touch points" in which Young provided support to Plaintiff. (Pl. Dep. Tr., ECF No. 37-4, at 168:5-13, 176:15-22 (acknowledging monthly meetings with Young and that she "has always been supportive" or "at least . . . appeared to be")). Young also attended Plaintiff's performance evaluation meetings with Smyth. (*Id.* at 205:3-7). Further, while Defendant refused to require Smyth to provide Plaintiff feedback primarily in writing, Plaintiff admits that Smyth did so at times. (*Id.* at 197:2-5).

"All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999). Employers can demonstrate "good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about

the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Id.* "The interactive process does not dictate that any particular concession must be made by the employer . . . ." *Id.* (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999)).  Here, Plaintiff's "insist[ance] on a single accommodation [was] unreasonable as a matter of law . . . ." *Id.* at 316 n.7.

Plaintiff's also indicated in her July 30, 2015 Workplace Accommodation Request that she could perform her job functions "if provided with a supportive and professional environment. Calm environment."  (July 30, Workplace Accommodation Request, ECF No. 39, at 3 (emphasis in original)).  To the extent that Plaintiff requested such an environment as an accommodation for her disability, courts have repeatedly found such vague requests for a less stressful or demanding workplace unreasonable as a matter of law.  *See Gaul*, 134 F.3d at 581 (finding it was "difficult to imagine a more amorphous 'standard' to impose on an employer" than ensuring its employee avoided "'prolonged and inordinate stress'"); *see also Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) ("employees are not guaranteed stress-free environments" by discrimination laws) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)); *Cobb v. Phila. Gas Works*, No. 01-4937, 2004 WL 764783, at *9 (E.D. Pa. Mar. 31, 2004) ("a move to a less stressful work environment is not a cognizable accommodation under the ADA"), *aff'd*, 118 F. App'x 584 (3d Cir. 2004).

Lastly, Plaintiff's PHRA claim based on the July 30, 2015 request is time-barred.  "To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." *Woodson*, 109 F.3d at 925 (citing 43 P.S. §§ 959(a), 962).  If she fails to do so, "she is precluded from judicial remedies under the

PHRA.  The Pennsylvania courts have strictly interpreted this requirement . . . ."  *Id.* (citations

omitted).  In this case, the alleged act of discrimination occurred on August 20, 2015, when

Hettinger spoke with Plaintiff about her request for accommodations.  (Def.'s Stmt. of

Undisputed Material Facts, ECF No. 37-2, at ¶ 93).  Plaintiff had 180 days, or until February 16,

2016, to file her administrative complaint.  *See Woodson*, 109 F.3d at 925.  However, she did not

file it until 22 days later, on March 9, 2016.  (Compl., ECF No. 1, at ¶ 20).

Plaintiff's requests to have a support person present for all meetings between Smyth and

her, for Smith to provide feedback mainly in writing, and for a less stressful workplace would

have proved disproportionately burdensome to Defendant.  Indeed, Plaintiff does not argue

otherwise.  Defendant engaged in good faith in providing alternative or partial accommodations.

Accordingly, the Court shall grant summary judgment in Defendant's favor on Plaintiff's failure

to accommodate claim based upon the July 30, 2015 Workplace Accommodation Request.

### b.        May 20, 2016 Workplace Accommodation Request

Plaintiff's May 20, 2016 Workplace Accommodation Request listed three

accommodations that Plaintiff believed would enable her to perform her job functions: (1) to

continue working from home "as needed" to manage stress; (2) "a transfer from [her] current

boss Nancy Smyth"; and (3) to have "all [her] interactions with Nancy Smyth to continue[7] to be

in the presence of another person and cannot be conducted in private with just Nancy and

Myself."  (May 20, 2016 Workplace Accommodation Request, ECF No. 39-1, at 5).  Plaintiff

also noted in a separate section that she could perform her job functions "if provided a safe,

supportive working environment."  (*Id.*).

---

[7]  Curiously, Plaintiff's choice of words suggests that all interactions between Smyth and
her were already occurring in the presence of a third party, yet Defendant denies that it granted
her earlier request to have a support person present for all meetings between the two.  (Def.'s
Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 33).

Defendant continued to allow Plaintiff to work from home a few days per month.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 110).  It refused to transfer Plaintiff after Hettinger confirmed with Bloch that no open suitable positions existed.  (*Id.* at ¶ 112).  Defendant also again refused Plaintiff's request to have no one-on-one interaction with Smyth.  (*Id.* at ¶ 114).  However, it agreed to provide someone from HR to attend Plaintiff's performance evaluation meetings with Smyth and to have Young attend other meetings between Plaintiff and Smyth.  (*Id.*).  Bloch also met with Smyth and Plaintiff to discuss how they could have productive meetings without a third party present.  (*Id.* at ¶ 115).

Defendant argues that Plaintiff "essentially wanted to keep her job and continue performing the same duties, but either report to a different manager or skip a level and report to a Director."  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 34).  It reiterates that Plaintiff's request to work in a "supportive" or less stressful environment was vague and unreasonable as a matter of law.  (*Id.*).  Plaintiff responds that Bloch "shut Plaintiff down" when she attempted to tell her about her disability and related problems and that Hettinger "simply took the word of the business unit that it was downsizing and no other job was available to Plaintiff," even though it had rotated Plaintiff and other employees in the past and had hired another associate manager approximately two months earlier.  (Pl.'s Resp., ECF No. 41-1, at 21).  She contends that Defendant's actions evidence a lack of good faith.  (*Id.*).  She also denies that she "insisted on keeping her same job but having a different supervisor . . . ."  (*Id.*).  Instead, she indicates that "she and her therapist made it clear that a transfer away from Ms. Smyth, wherever that may be, was the imperative . . . ."  (*Id.* at 22).  In reply, Defendant points to Plaintiff's deposition testimony and request form stating that she wanted to remain in her current role.  (Def.'s Reply, ECF No. 45, at 11 (citations omitted)).  It argues that in any event a transfer to another position to avoid the stress of working with someone is unreasonable as a matter of law

34

and that Plaintiff has failed to introduce evidence of an open equivalent position. (*Id.* at 12 (citations omitted)).

The Court has already addressed Plaintiff's requests to have no one-on-one interaction with Smyth and to have a "supportive" workplace. (*See supra* § III.D.2.a). Accordingly, the Court will focus on Plaintiff's request for a transfer, as the parties do in their briefing.

In her May 20, 2016 Workplace Accommodation Request, Plaintiff stated: "I am seeking a transfer from my current boss Nancy Smyth. . . . I would like to remain the Associate Manager over the Variable Calcs function . . . [but] be[ ] moved to another manager (or Director) as I know Associate Managers have reported to a Director in the past." (May 20, 2016 Workplace Accommodation Request, ECF No. 39-1, at 5). At her deposition she also responded, "Yes," to the question: "Did you want to keep your same job, keep your same job duties, just have somebody else manage you?" (Pl. Dep. Tr., ECF No. 37-4, Ex. 1 at 247:7-10). In response to Plaintiff's request, "Hettinger spoke with Bloch in Human Resources to confirm that there were no positions available into which Plaintiff could transfer." (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 112).

As noted in the preceding section, "by asking to be transferred away from individuals who cause him prolonged and inordinate stress, [a plaintiff] is essentially asking this court to establish the conditions of his employment, most notably, with whom he will work." *Gaul*, 134 F.3d at 581; *see also* May 20, 2016 Workplace Accommodation Request, ECF No. 39-1, at 5 ("The environment in which I work is unsupportive and continues to be very stressful for me working under Nancy Smyth."). However, the ADA does not permit the Court to take this action. *Gaul*, 134 F.3d at 581. "This analysis in *Gaul* has been applied by numerous courts . . . which have found that a request to return to work under a different supervisor is . . . unreasonable." *Ashelman v. Geisinger Health Sys. Found.*, No. 3:16-CV-1837, 2018 WL

3827155, at *4 (M.D. Pa. July 18, 2018) (citing *Coulson v. Goodyear Tire & Rubber Co.*, 31 F.

App'x 851, 858 (6th Cir. 2002); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir.

1996)) (internal quotations and additional citations omitted); *see also Larson v. Va. Dep't of*

*Transp.*, Civ. No. 5:10-cv-0136, 2011 WL 1296510, at *2 (W.D. Va. Apr. 5, 2011) (compiling

cases holding "that such an accommodation is unreasonable as a matter of law").

      Even if Plaintiff remained open to moving to a new position with a different supervisor,

her requested accommodation was not reasonable as a matter of law. *See also Baylets-Holsinger*

*v. Pa. State Univ.*, No. 4:18-CV-0060, 2018 WL 6253981, at *7 (M.D. Pa. Oct. 30, 2018)

(plaintiff failed to state a claim based on employer's refusal "to provide her with a different job

and a different supervisor"). Moreover, she also fails to offer evidence of an open suitable

alternative position. She contends that Defendant had a "history of rotating employees" and that

it had rotated Plaintiff herself six times over the course of her sixteen-year career with

Defendant, but she fails to show that an alternative open position existed at the time of her

request. (*See* Pl.'s Resp., ECF No. 41-1, at 21). She claims that Defendant had hired a new

Associate Manager in a different department two months earlier and that Defendant could have

switched Plaintiff with the new hire, but she ignores the fact that "an employer is not required to

'bump' other employees to create a vacancy so as to be able to reassign the disabled employee."

*Weiler*, 101 F.3d at 526 (quoting *Gile*, 95 F.3d at 499). "Nor is an employer obligated to create a

'new' position for the disabled employee." *Id.* (quoting *Gile*, 95 F.3d at 499).

      In short, Defendant had no obligation under the ADA to transfer Plaintiff to a new

position or new supervisor. Rather, "that decision remains with the employer." *Id.* In any event,

Plaintiff has introduced no evidence of a different open position to which Defendant could have

transferred her, had it been so inclined. Accordingly, the Court shall grant summary judgment in

Defendant's favor on Plaintiff's failure to accommodate claim based upon the May 20, 2016

Workplace Accommodation Request as well.

### D.   Hostile Work Environment

#### 1.   Background Law

The ADA expressly prohibits discrimination in the terms, conditions or privileges of

one's employment on the basis of disability.  An employer violates this prohibition "when the

workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d

295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91

L.Ed.2d 49 (1986)).  A claim for hostile work environment based on disability requires a plaintiff

to establish that: (1) he is a qualified individual with a disability under the ADA; (2) he was

subject to unwelcome harassment; (3) the harassment was based on his disability or a request for

an accommodation; (4) it was sufficiently severe or pervasive to alter the conditions of his

employment and created an abusive working environment; and (5) that defendant knew or should

have known of the harassment but failed to take prompt effective remedial action.  *See Walton*,

168 F.3d at 667.

To prove an abusive working environment, a plaintiff must show that the environment

was objectively hostile or abusive.  The plaintiff must also show that she perceived the

workplace to be hostile or abusive.  *Walton*, 168 F.3d at 668.  "A recurring point in harassment

opinions is that simple teasing, offhand comments and isolated comments (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of employment."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

The determination of whether a work environment is hostile or abusive is made by examining the

totality of circumstances.  The totality of the circumstances includes evaluating factors such as

the "frequency of the discriminatory conduct; its severity; whether it is threatening or

humiliating or a mere offensive utterance; and whether it unreasonably interferes with an

employees work performance."  *Harris*, 510 U.S. at 23.

The "abusive working environment" element ensures that harassment claims do not turn

the ADA into a general civility code, and ensures that only behavior that is "so objectively

hostile as to alter the terms and conditions of one[']s employment" will be actionable.  *Harris*,

510 U.S. at 21.  Furthermore, the inquiry into the severity of harassment requires "careful

consideration of the social context in which particular behavior occurs and is experienced by its

target."  *Id.*

### 2.    Application

In its brief, Defendant challenges Plaintiff's hostile work environment claim on two

grounds.  First, it asserts that Plaintiff cannot establish that Smyth harassed her due to her

disability because Plaintiff acknowledges that Smyth subjected other employees to the same

behavior.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 35-36).  Second, it

argues that Smyth's conduct was not "severe or pervasive" enough to create an actionable hostile

work environment.  (*Id.* at 37).  It characterizes Smyth's comments to Plaintiff as "insensitive"

but ultimately "isolated incidents[.]"  (*Id.* at 38).  Defendant also summarizes the facts of a few

cases in which courts held that a supervisor's unprofessional comments and actions did not

substantiate a claim for hostile work environment.  (*Id.* at 38-40).  Defendant contends that

Smyth's conduct in this case was "far less egregious," thus compelling the entry of summary

judgment in its favor as to Plaintiff's claim.  (*Id.* at 39-40).

Plaintiff responds that even if Smyth was hostile to others as well, she demonstrated

hostility to Plaintiff based upon her disability when she told Plaintiff, "Well, maybe you don't

belong here, maybe this isn't the job for you," after Plaintiff mentioned her "disability that cause[s] auto responses with her body language" to Smyth.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 44; Pl.'s Resp., ECF No. 41-1, at 22).  She claims that Smyth physically threatened her by making a handgun gesture pointed at Plaintiff's head and saying, "I'll give it to you straight between the eyes and you better learn how to take it," and also by responding to Plaintiff's expressed concerns about retaliation with, "Oh, Abby, you're a grown woman, what am I going to do?  Beat you up."  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 45; Pl.'s Resp., ECF No. 41-1, at ¶ 45; Pl.'s Resp., ECF No. 41-1, at 22-23; Pl. Dep. Tr., ECF No. 43, Ex. A at 132:19-21).  Plaintiff alleges that Smyth also mocked her about receiving a poor evaluation and frequently laughed at her.  (Pl.'s Resp., ECF No. 41-1, at 23).  She claims that a reasonable person within her protected class would have viewed Smyth's statements and actions as hostile.  (*Id.* (citing THIRD CIRCUIT MODEL JURY INSTRUCTIONS – CIV., 5.1.4 – 5.1.5 (2019))).

In reply, Defendant points to Plaintiff's deposition testimony in which she agreed that Smyth "create[ed] a hostile work environment . . . that impacted everyone" and cites cases holding that "'equal opportunity harassment' is ***not*** actionable as a matter of law."  (Def.'s Reply, ECF No. 45, at 14-15) (citations omitted) (emphasis in original).  It argues that only one exchange between Smyth and Plaintiff makes any reference to Plaintiff's disability and that the exchange does not become actionable based on this reference (in any event made by Plaintiff, not Smyth).  (*Id.* at 15 (citations omitted)).  It points out that, in Plaintiff's own words, she alleges only "demeaning conduct," which the ADA does not cover.  (*Id.* at 15-16 (citing Pl.'s Resp., ECF No. 41-1, at 23 (additional citations omitted))).  Defendant concludes by noting that Plaintiff does not attempt to distinguish its cited cases holding similar supervisor conduct insufficient as a matter of law to establish a claim for hostile work environment.  (*Id.* at 16-17).

At her deposition, Plaintiff agreed that Smyth was "insensitive to everyone," "was a bully and . . . mistreated everyone," subjected Plaintiff and others to the same behavior, and "create[ed] a hostile work environment . . . that impacted everyone[.]"  (Pl. Dep. Tr., ECF No. 37-4, at 141:21-142:3, 142:7-13, 143:2-4, 194:2-4).  It appears that Smyth could have equally directed much of the conduct about which Plaintiff complains at anyone.  Smyth's mocking Plaintiff for receiving a poor evaluation and laughing at her, on their face, had nothing to do with Plaintiff's disability and could have as easily been directed at another employee.  (*See* Pl. Dep. Tr., ECF No. 43, Ex. A at 146:21-25).  Even Smyth's comment, "what am I going to do?  Beat you up[,]" could have been directed to another employee expressing concern about retaliation. (Pl. Dep. Tr., ECF No. 43, Ex. A at 132:19-21).  None of these comments or actions appear motivated by Plaintiff's disability, given Plaintiff's own testimony that Smyth treated "everyone" like this.  (Pl. Dep. Tr., ECF No. 37-4, at 141:21-142:3, 142:7-13, 194:2-4).  As such, they cannot substantiate a claim for hostile work environment.  *See Betz v. Temple Health Sys.*, No. 15-00727, 2015 WL 4713661, at *4 (E.D. Pa. Aug. 7, 2015) ("equal opportunity offenders" who create "an uncouth, unprofessional, and offensive workplace . . . for all . . . regardless of" employees' protected traits do not establish an actionable work environment); *Connell v. Principi*, No. 04-1356, 2007 WL 3274185, at *11 (W.D. Pa. Nov. 5, 2007) (actions of "equal opportunity harasser who did not discriminate" upon the basis of protected traits were not actionable); *Koschoff v. Hendeson*, 109 F. Supp. 2d 332, 346 (E.D. Pa. July 13, 2000), *aff'd sub nom. Koschoff v. Runyon*, 35 F. App'x 357 (3d Cir. 2002) ("seemingly discriminatory behavior when actually motivated by personal animosity is not prohibited") (citation omitted).

Nonetheless, even considering this conduct in conjunction with Smyth's comments arguably relating to Plaintiff's disability, the Court finds that Plaintiff has failed to introduce evidence permitting a jury to conclude that Smyth created an actionable hostile work

environment for Plaintiff.  In an April 22, 2015 coaching session between Smyth and Plaintiff, Smyth informed Plaintiff that she did not appreciate Plaintiff's body language during a meeting earlier that day with the other Associate Managers and Smyth.  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 44).  Plaintiff replied that she had a disability that causes automatic bodily responses, to which Smyth responded, "Well, maybe you don't belong here, maybe this isn't the job for you."  (*Id.*).  Later in this same conversation, Smyth simulated a gun with her hand, pointed it at Plaintiff's head and stated, "I'm not Joanne Minor, I'll give it to you straight between the eyes and you better learn how to take it."  (*Id.* at ¶ 45).

Plaintiff contends that the handgun gesture and accompanying comment, as well Smyth's "beat you up" comment, were "physically threatening or humiliating" and, as such, created a hostile work environment.  (Pl.'s Resp., ECF No. 41-1, at 23).  The Court disagrees.  Smyth's simulation of a gun with her hand was, to be sure, wholly unprofessional and inappropriate. However, her comment to Plaintiff made simultaneously with the gesture demonstrates that she intended no physical threat, nor could someone in Plaintiff's position perceive that a physical threat was intended.  Smyth's reference to giving Plaintiff "it" between the eyes was clearly a reference to the coaching or criticism that had induced Plaintiff's automatic body language responses that the pair had just discussed.  (*See* Bloch Dep. Tr., ECF No. 42, Ex. I at 62:4-8 ("She mentioned giving feedback right between the eyes, and you'll have to deal with it.")). This fact is evident from Smyth's references to not being Joanne Minor and to Plaintiff's learning "to take it."  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 45).  It defies logic to infer that Smyth was suggesting that, although Minor did not shoot employees, Smyth would.  Nor could anyone infer that Smyth was indicating that Plaintiff could "learn to take" a gunshot "between the eyes . . . ."  (*Id.*).  Courts have found that similarly aggressive actions by supervisors did not establish a hostile work environment.  *See, e.g., Ballard-Carter v.*

*Vanguard Grp.*, 703 F. App'x 149, 150-52 (3d Cir. 2017) (pointing finger at employee and telling her "you just pissed me off," plus "repeated comments about her hearing difficulty and dyslexia" and "relentless . . . criticism" did not rise to the level of a hostile work environment); *Mercer*, 26 F. Supp. 3d at 438, 445 (calling an employee "fat," frequently cursing at him and dropping something on the floor in front of his coworkers and telling him to "pick it the fuck up" did not rise to the level of a hostile work environment).

Smyth's "beat you up" comment also falls short of constituting an actual physical threat. In a meeting between Smyth and Plaintiff, Plaintiff told Smyth she was "afraid of her and retaliation." (Pl. Dep. Tr., ECF No. 43, Ex. A at 132:19-20). Smyth responded, "Oh, Abby, you're a grown woman, what am I going to do? Beat you up." (*Id.* at 132:20-21). Far from threatening physical violence, this statement seems to have disavowed it. Smyth appears to have been pointing out the absurdity of resorting to violence to resolve a problem with another adult after Plaintiff raised the issue of "fearing" Smyth. In any event, and giving Plaintiff the benefit of the doubt, this ambiguous statement did not create a hostile work environment, either on its own or along with Smyth's other statements and conduct. *See Walton*, 168 F.3d at 667 ("To prove an 'abusive work environment[,]' the environment must be shown to be objectively hostile or abusive . . . .") (citing *Harris*, 510 U.S. at 22, 114 S.Ct. at 371 (1993); *Medvic v. Compass Sign Co., LLC*, No. 10-5222, 2011 WL 3513499, at *12 (E.D. Pa. Aug. 10, 2011) ("only behavior that is 'so objectively hostile as to alter the terms and conditions of one[']s employment' will be actionable")).

The last piece of evidence Plaintiff cites in her opposition in support of her hostile work environment claim is Smyth's comment, "Well, maybe you don't belong here, maybe this isn't the job for you." (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 44; Pl.'s Resp., ECF No. 41-1, at 22). Smyth made this comment during the April 22, 2015 coaching session

after Plaintiff "told Smyth that she had a disability that caused auto responses with her body language."  (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 44).  This comment – effectively telling Plaintiff that if she exhibited signs of her disability she should consider finding another job – was offensive, and Plaintiff no doubt perceived it as such.  However, "[c]onversations in which a prohibited class status is discussed, though offensive[,] are insufficient."  *Williams v. Pa. Hum. Rels. Comm'n*, No. 14-1290, 2016 WL 6834612, at \*22 (W.D. Pa. Nov. 21, 2016) (citing *Witcher v. Sodexho*, 247 F. App'x 328, 331 (3d Cir. 2007)).  Moreover, the Court finds this comment similar to those found insufficiently severe or pervasive in *Walton*.  *See Walton v. Mental Health Ass'n of Se. Pa.*, No. 96-5682, at \*13 (E.D. Pa. Nov. 17, 1997) ("you have to learn to manage your illness," "you have to make a decision of either you can work or you're either too sick to work and you shouldn't be working").

Plaintiff has failed to present evidence that would permit a reasonable jury to conclude that Smyth subjected her to a hostile work environment.  Much of Smyth's complained-of conduct did not relate to Plaintiff's disability and appears to have occurred because, in Plaintiff's words, Smyth "was a bully and she mistreated everyone."  (Pl. Dep. Tr., ECF No. 37-4, at 143:2-4).  Further, even considering all of Plaintiff's proffered evidence, Smyth's conduct was insufficiently severe or pervasive to create a hostile work environment.  The Court shall grant summary judgment in Defendant's favor as to Plaintiff's hostile work environment claim.

### E.    After-Acquired Evidence Defense

#### 1.    Background Law

The after-acquired evidence defense does not preclude a defendant's liability under the ADA but limits the relief available to the plaintiff.  *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 356, 361 (1995).  As the Supreme Court explained in *McKennon*: "Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we

cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." *Id.* at 362.  "[A]s a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy [because] [i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *Id.* at 361-62.  If the defendant "proves that it would have terminated the plaintiff's employment for the reason revealed by the after-acquired evidence, . . . backpay should run from the discharge to the time that the wrongdoing was discovered . . . ."[8]  *Mardell*, 65 F.3d at 1073-74 (citing *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1108-09 (5th Cir. 1995); *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1154 n.5 (6th Cir. 1995)).  To invoke the defense, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362-63.

### 2.    Application

Defendant asserts that the court in *Nesselrotte v. Allegheny Energy, Inc.*, 615 F. Supp. 2d 397 (W.D. Pa. Mar. 23, 2009) applied the after-acquired evidence defense on facts similar to those here.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 37-1, at 41-42).  In that case, Nesselrotte, an attorney, downloaded documents of her employer, Allegheny Energy, Inc. (Allegheny), to a personal disk in anticipation of her termination and after receiving formal notice of it. *Id.* at 399-400, 403.  She had signed a Confidentiality Agreement and was also

---

[8] In addition, "truly exceptional circumstances may be considered in fashioning appropriate relief." *Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 (3d Cir. 1995) (per curiam).  The parties do not identify any such circumstances in this case.

bound by an Ethics Code. *Id.* at 399, 403. At least some of the documents were marked confidential and subject to the attorney-client privilege. *Id.* at 400. She did not have permission to take the documents, but she did so because she believed her employer had discriminated against her. *Id.* at 400-01. Nesselrotte showed the documents to no one other than her attorneys. *Id.* at 401.

Nesselrotte argued that the after-acquired evidence defense did not apply for three reasons. First, she contended that the Confidentiality Agreement and Ethics Code did not cover the documents at issue. *Id.* at 403. Second, she argued that she took the documents only after Defendant notified her of her termination and only for purposes of proving her discrimination claim. *Id.* at 404-05. Third, she asserted that a genuine issue of material fact existed regarding whether Allegheny would have terminated her for her actions. *Id.* at 406.

The court rejected these arguments. It found that the attorney-client privileged documents met the Confidentiality Agreement's definition of "Confidential Information" and that Nesselrotte's downloading of these documents, removal of them from Allegheny's premises, and failure to return them upon her termination violated the Agreement.[9] *Id.* at 404. Next, the court observed that Nesselrotte's attempted justification of her actions as necessary to support her discrimination claim was indistinguishable from the plaintiff's rejected justification in *McKennon. Id.* (citing 513 U.S. at 355). It also concluded that Nesselrotte's transgression of the attorney-client relationship made "the favored and more traditional remedy of reinstatement" "impractical" and "inequitable." *Id.* (internal quotations and citations omitted). Lastly, the court

---

[9] Because the court found that Nesselrotte's misuse of the attorney-client privileged documents violated the Confidentiality Agreement, it did not determine whether her actions as to nonprivileged documents also violated the Confidentiality Agreement, nor did it determine whether her actions violated the Ethics Code. *See Nesselrotte*, 615 F. Supp. 2d at 403-04, 404 n.10.

noted that Nesselrotte introduced no evidence beyond her own testimony that Allegheny would not have terminated her for her actions, whereas Allegheny had submitted affidavits attesting that it would have terminated her immediately had it known of her misconduct and that, in fact, it had fired another employee who had engaged in similar conduct. *Id.* For these reasons, the court granted summary judgment in Allegheny's favor as to the after-acquired evidence defense and limited her potential recovery to back pay from the date of her termination to the date of Allegheny's discovery of her misconduct. *Id.*

Here, the undisputed evidence shows that in the summer and fall of 2016 Plaintiff forwarded thousands of Defendant's documents to her personal email account. (Limsky Cert., ECF No. 37-9, at ¶ 5). Similar to *Nesselrotte*, many of the documents were proprietary and confidential.[10] (*Id.* at ¶ 6; *see Nesselrotte*, 615 F. Supp. 2d at 400). Like Nesselrotte, she took the documents because she anticipated that her employer would terminate her. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 137; *see also* Pl.'s Resp., ECF No. 41-1, at 24; *Nesselrotte*, 615 F. Supp. 2d at 405). Neither demonstrated any intention to return the documents. (Limsky Cert., ECF No. 37-9, at ¶ 7; *see Nesselrotte*, 615 F. Supp. 2d at 404). Also as in *Nesselrotte*, Plaintiff lacked permission to take the documents, her misappropriation of them violated company policy, and her employer would have terminated her had it known about the misappropriation. (Limsky Cert., ECF No. 37-9, at ¶ 8). Specifically, Defendant's Communications Standards permitted Plaintiff to send "confidential, privileged, proprietary or sensitive business-related information or trade secrets . . . outside Prudential only if there is a legitimate business need . . . ." (Limsky Cert., ECF No. 37-9, Tab 1, at 1). The Communications

---

[10] The documents included "capacity modeling, strategy and business plans such as forecasting and planned attrition, and employee satisfaction reporting results for herself and other Prudential employees." (Limsky Cert., ECF No. 37-9, at ¶ 6).

Standards expressly prohibited "[f]orwarding e-mail from your Prudential account that contains proprietary Prudential Information to your personal e-mail . . . ." (*Id.*).  Similarly, Defendant's Information Policy required Plaintiff to "safeguard," "protect and secure" its information; prevent its "improper use and disclosure"; and use it "for appropriate business purposes only . . . ." (*Id.* Tab 2, at 1).

Notwithstanding these similarities, Plaintiff attempts to distinguish her conduct from Nesselrotte's on four bases.  First, she points out that Nesselrotte executed a Confidentiality Agreement with Allegheny, whereas Plaintiff "did not violate an agreement with her employer . . . ." (Pl.'s Resp., ECF No. 41-1, at 24).  But *McKennon* only requires "wrongdoing that would lead to a legitimate discharge . . . ." 513 U.S. at 362.  It does not require that the wrongdoing violate an "agreement" between the employer and employee.  *See id.*; *cf. Nesselrotte*, 615 F. Supp. 2d at 405 (noting Nesselrotte admitted that she also owed a fiduciary duty to Allegheny).  Plaintiff does not dispute that the Communications Standards and Information Policy applied to her or that violation of them constituted grounds for termination. (Def.'s Stmt. of Undisputed Material Facts, ECF No. 37-2, at ¶ 141; Limsky Cert., ECF No. 37-9, at ¶ 8; *see also* Pl.'s Resp., ECF No. 41-1, at 23-24).  Whether Plaintiff violated Defendant's "agreement" or "standards" or "policy" is immaterial.  What matters is that her malfeasance, if known, would have resulted in a legitimate termination.  *See McKennon*, 513 U.S. at 362.

Second, Plaintiff observes that she did not "steal attorney-client information as in *Nesselrotte*." (Pl.'s Resp., ECF No. 41-1, at 24).  It is true that the court limited its consideration to the attorney-client privileged documents taken by Nesselrotte.  615 F. Supp. 2d at 403-04. However, it apparently did so because Nesselrotte argued that none of the documents she misappropriated were covered by the Confidentiality Agreement, and this argument was, according to the court, "[n]aturally" incorrect insofar as it related to attorney-client privileged

documents.  *Id.*  Plaintiff cites no authority requiring that where the employee wrongdoing is misappropriation of documents, the documents must be subject to the attorney-client privilege for the defense to apply.  (Pl.'s Resp., ECF No. 41-1, at 23-24).

Third, Plaintiff notes that she "did not forward *any* documents that she did not have access to in the normal course of her employment."  (*Id.* (emphasis in original)).  However, it is unclear that Nesselrotte did so.  *Nesselrotte*, 615 F. Supp. 2d at 400 (noting that the documents Nesselrotte downloaded were "on her work computer").  In any event, Plaintiff's forwarding of the documents to her personal email violated Defendant's Communications Standards and Information Policy and constituted grounds for termination, whether she had authorization to use the documents for other purposes or not.  (Limsky Cert., ECF No. 37-9, at ¶ 8).

Fourth, Plaintiff complains that the after-acquired evidence "defense only becomes relevant under a scenario where something caused by proven discriminatory conduct (the forwarding of the documents here) perversely would bar a remedy for that conduct."  (Pl.'s Resp., ECF No. 41-1, at 24).  However, the courts in both *McKennon* and *Nesselrotte* rejected similar arguments.  *Nesselrotte*, 615 F. Supp. 2d at 405; *see also McKennon*, 513 U.S. at 355.  Further, Defendant did not "cause" Plaintiff to misappropriate its documents.  Plaintiff chose to take them in violation of Defendant's policies rather than seek them in discovery in any subsequent litigation.

Plaintiff's attempts to distinguish *Nesselrotte* do not convince this Court that a different result should occur in this case.  The undisputed evidence shows that Plaintiff forwarded thousands of Defendant's documents to her personal email address in violation of Defendant's policies.  Defendant has "establish[ed] that the wrongdoing was of such severity that [Plaintiff] in fact would have been terminated on those grounds alone if [Defendant] had known of it at the time of the discharge."  *See McKennon*, 513 U.S. at 362-63.  The Court shall grant summary

judgment in favor of Defendant as to its after-acquired evidence defense.  Accordingly, Plaintiff

may not seek reinstatement or front pay.  If Plaintiff prevails at trial, the Court shall calculate her

back pay from the date of her termination through the date Defendant learned of her misconduct.

*See id.* at 362.


## IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion.

The Court grants summary judgment in favor of Defendant on Plaintiff's retaliation, failure to

accommodate and hostile work environment claims and on Defendant's after-acquired evidence

defense.  The Court denies summary judgment on Plaintiff's discrimination claim.


BY THE COURT:


   /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge